UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KEVIN CAMPBELL,

      Plaintiff,                            Case No. 16-cv-12922
                                             Hon. Matthew F. Leitman

v.

DANIEL MACK, *et al.*,

      Defendants.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF #73)

In this action, Plaintiff Kevin Campbell alleges that Defendant Daniel Mack, a police officer with the City of Allen Park, violated his (Campbell's) First and Fourth Amendment rights during and after a traffic stop on June 7, 2016. (*See* Am. Compl., ECF #28.)  Campbell alleges, among other things, that Mack pulled over Campbell's minivan without probable cause, tightened Campbell's handcuffs in response to Campbell's complaints that the cuffs were too tight, and subjected Campbell to an invasive strip and body cavity search that included Mack placing a finger inside Campbell's anus. (*See id.*)  Campbell further claims that Allen Park failed to properly train Mack and that it condoned Mack's conduct.  (*See id.*)

Mack and Allen Park deny Campbell's claims, and they have now moved for summary judgment. (*See* Mot., ECF #73.)  Myriad factual disputes exist here that prevent the Court from granting Mack and Allen Park judgment as a matter of law

1

on most of Campbell's claims. Therefore, for the reasons stated below, Mack and Allen Park's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**.[1]

## I

In the early evening of June 7, 2016, Campbell was driving on the northbound Southfield Freeway in Allen Park, Michigan. (*See* Campbell Affidavit at ¶4, ECF #80-2 at Pg. ID 963; *see also* Campbell Dep. at 73, ECF #73-3 at Pg. ID 739.) Mack, an Allen Park police officer, was monitoring traffic on the shoulder of the freeway with his police dog when he pulled behind Campbell and initiated a traffic stop. (*See id.* at ¶¶ 14-15, 17, Pg. ID 964.) The parties have provided sharply conflicting evidence that paints different versions of the stop and its aftermath.

## A

Mack has presented evidence of the following version of events. Mack says that on the day in question, he and his police dog Clyde were parked on the shoulder

---

[1] In Campbell's Amended Complaint, he also brings claims against two other Allen Park police officers, Patrick Moore and Kevin Gersky. (*See* Am. Compl. at ¶39, ECF #28 at Pg. ID 144.) In Campbell's response to Defendants' motion, he agreed to "dismiss the claims against Defendants Gersky and Moore." (Resp. to Mot., ECF 380 at Pg. ID 922.) The Court will therefore **GRANT** Defendants' motion to the extent it is directed at the claims made against Gersky and Moore, and it will **DISMISS** those claims **WITH PREJUDICE**. Likewise, Campbell has agreed that his claims directed at Mack in his "official capacity" are "duplicative and unnecessary." (*See id.* at Pg. ID 913.) The Court will therefore **GRANT** Defendants' motion to the extent it is directed at the claims made against Mack in his official capacity, and it will **DISMISS** those claims **WITH PREJUDICE**.

of the northbound Southfield Freeway monitoring traffic. (*See* Mack Dep. at 42, ECF #73-2 at Pg. ID 711.)  Mack observed Campbell's minivan drive past him, and he noticed that "[t]here was no license plate on the vehicle." (*Id.* at 46, Pg. ID 712.) Because Mack could not see a license plate, he began following and eventually stopped Campbell. (*See id.* at 46-47, Pg. ID 712.)  "After [Mack] stopped [Campbell's] vehicle[,] [he] observed a piece of paper in the back window.  Due to the tint on the window[,] [Mack] couldn't read anything on that." (*Id.* at 51, Pg. ID 713.)

Mack walked up to Campbell's driver's side door and asked Campbell for his driver's license and registration.  (*See id.* at 47, Pg. ID 712.)  Campbell could not provide a valid driver's license, and Mack therefore "had [] Campbell step [out of] the vehicle." (*Id.* at 48, Pg. ID 712.)  Mack then noticed that Campbell's pants were unzipped. (*See id.* at 53, Pg. ID 713.)  Mack later "asked [Campbell] why his pants were unzipped" and Campbell "didn't have an explanation." (*Id.*)  Mack then "placed [Campbell] under arrest for driving without a driver's license." (*Id.* at 48, Pg. ID 712)  Mack handcuffed Campbell without incident – there were "no problem[s]" cuffing Campbell – and Mack placed Campbell in the back seat of Mack's squad car. (*Id.* at 49, Pg. ID 712.)  Mack asked Campbell where he was coming from and where he was going, and Campbell responded that he was "coming

from a friend's house … in either Livonia or Westland … and he was going home to his house in Wixom." (*Id.* at 53, Pg. ID 713.)

Mack then walked his police dog Clyde around Campbell's minivan so that Clyde could conduct "an exterior sniff of the outside of [the] vehicle." (*Id.* at 55, Pg. ID 714.) When Clyde sniffed the front driver's side door of the minivan, he "scratch[ed]" at the door, a signal that "indicated … the presence of narcotic odor." (*Id.*)  Mack then "opened the driver's door and had [Clyde] jump up in the vehicle to search the interior of the vehicle for the presence of narcotic odor." (*Id*.)  Clyde then "indicated" again by "scratching" at the front driver's side seat. (*Id.* at 56, Pg. ID 714.)  Mack then placed Clyde back in the squad car and searched "the entire vehicle." (*Id.*)  Mack did not find any evidence of narcotics. (*See id.*)

Mack then waited for a tow truck to arrive to tow Campbell's minivan from the scene.  At that time, Mack noticed "Campbell [] making numerous movements throughout the back of the [police] vehicle, jostling around." (*Id.* at 57, Pg. ID 714.) Mack believed that Campbell "was attempting to hide narcotics on his person or he was attempting to place them in a different area than he had already hidden them on his person." (*Id.*)  Mack then told Campbell that due to Campbell's actions during the stop, Mack believed that Campbell was trying to hide narcotics, and that Mack would need to perform a strip search of Campbell at the police station:

> I told Mr. Campbell that I believe[d] he was attempting to hide narcotics further on his person.  And I told him that – explained to him that his story of where he was coming from and where he was going to and he got to the area that he was at led to me believe that there was something further to his story.  I told him due to his pants being unzipped and the amount of movement he was making in the back seat of the patrol car that once we got to the police station we were going to conduct a strip search of his person.

(*Id.* at 58, Pg. ID 715.)  The tow truck then arrived, and Mack transported Campbell to the Allen Park police department. (*See id.* at 60, Pg. ID 715.)

Mack conducted the strip search of Campbell in the booking area of the station. (*See id.* at 66-67, Pg. ID 717.)  Mack acknowledges that during this search he "grab[bed]" the outside of Campbell's underwear in order to "pull [the underwear] away from [Campbell's] body" (*id.* at 67-68, Pg. ID 717), but Mack denies placing his fingers inside of Campbell's anus. (*See* Mot., ECF #73 at Pg. ID 664.) Mack did not find any narcotics during this search. (*See* Mack Dep. at 68-69, ECF #73-2 at Pg, ID 717.)

### B

Campbell has provided evidence of a much different version of events. Campbell says that on the day in question, he was driving his wife's minivan from his home in Flat Rock, Michigan to deliver food to an ill friend, who lived in Detroit. (*See* Campbell Aff., ECF #80-2 at ¶4, Pg. ID 963; *see also* Campbell Dep. at 76-77, ECF 373-3 at Pg. ID 739-40.)  Campbell's wife had recently purchased the minivan,

5

so the van had "a temporary [license] plate taped on all sides flush to the back window." (*Id.* at ¶7, Pg. ID 963; *see also* Campbell Dep. at 75, ECF #73-3 at Pg. ID 739.)  At the time of the traffic stop, it was "broad daylight" with "good" visibility, and the temporary license tag was "easily visible from at least 20 yards behind the vehicle." (*Id.* at ¶¶ 6, 8, Pg. ID 963; Campbell Dep. at 76, ECF #73-3 at Pg. ID 739.)

After Mack initiated the traffic stop, Campbell pulled to the side of the road. "Mack [then] approached the driver's side window and asked [Campbell] for [his] driver's license and registration." (*Id.* at ¶18, Pg. ID 964.)  Campbell did not have a driver's license, so he "handed Mack [his] state ID" instead. (*Id.* at ¶19, Pg. ID 964.) Campbell also provided Mack "all of the paperwork [he] had for the automobile." (Campbell Dep. at 84, ECF #73-3 at Pg. ID 741.)  Mack then asked Campbell to exit the minivan, which Campbell did. (*See id.* at 85, Pg. ID 742.)  Campbell insists that "when [he] left his wife's vehicle, [his] pants were zipped." (Campbell Aff. at ¶23, ECF #80-2 at Pg. ID 965; *see also* Campbell Dep. at 95-95, ECF #73-3 at Pg. ID 744.)

Shortly after Campbell stepped out of the van, "Mack jostled [him], turned [him] around[,] and handcuffed [him] very tightly." (*Id.* at ¶21, Pg. ID 964.)  Mack also conducted a "patdown" search of Campbell at that time. (*See id.* at ¶22, Pg. ID 965.)  Mack then placed Campbell in the back of Mack's squad car. (*See id.* at ¶24, Pg. ID 965.)  As Campbell was sitting in the back of Mack's police car, he asked

Mack to loosen the handcuffs because they were too tight and were hurting his wrists. (*See* Campbell Dep. at 87-88, ECF #73-3 at pg. ID 742.)  Instead of loosening the cuffs, Mack came over to Campbell, "tightened them," and told Campbell that "[t]hat's the loosest they're going to get." (*Id.* at 88, Pg. ID 742.)  Mack then accused Campbell of stealing the minivan, which Campbell denied. (*See id.* at 90, Pg. ID 743.)  Campbell also explained to Mack where he was going – that he was "coming from home" and travelling to a friend's house. (*Id.* at 97, Pg. ID 745.)  Campbell never specifically said where his "home" was. (*See id.*)

Mack then took his police dog out of his squad car and over to Campbell's van. (*See id.* at 91, Pg. ID 743.)  Mack did not walk the dog around Campbell's van. Instead, Mack "put the dog directly into the van." (*Id.* at 93, Pg. ID 744.)   Once the dog got into Campbell's van, Campbell "really couldn't see what was going on." (*Id.* at Pg. ID 744.)  After a few minutes, Mack returned the dog to his police car. (*See* Campbell Aff. at ¶32, ECF #80-2 at Pg. ID 965.)

Campbell then remained seated in the back of Mack's squad car while Mack searched Campbell's van.  "At no time while seated in the backseat, was [Campbell] moving around." (*Id.* at ¶38, Pg. ID 966.)  While Mack and Campbell were awaiting a tow truck to tow Campbell's van from the scene, "Mack never mentioned his purported probable cause to search [] the minivan or to do an additional personal search … back at the station." (*Id.* at ¶40, Pg. ID 966.)  After the tow truck arrived,

Mack transported Campbell to the Allen Park police station for booking on charges of driving with a suspended driver's license.

Mack took Campbell "to a booking area" once they arrived at the police station. (Campbell Dep. at 104, ECF #73-3 at Pg. ID 746.)  Mack "pat[ted Campbell] down again" and took Campbell's handcuffs off. (*Id.*)  Campbell then complained about the tightness of the cuffs, and he attempted to show Mack bruises on his (Campbell's) wrists. (*See id.* at 105, Pg. ID 747.)  Mack responded that "[h]andcuffs leave marks on everybody." (*Id.*)

Mack then decided to perform a strip search of Campbell in order to find contraband that Mack believed Campbell was hiding.  Mack had Campbell step into a cage inside the booking area, and he told Campbell to "drop 'em," referring to Campbell's pants. (*Id.* at 107, 110, Pg. ID 747-48.)  Campbell objected to taking off his pants, and Mack told Campbell that Campbell was "going to get naked." (*Id.* at 110, Pg. ID 748.)  Mack then "pulled down [Campbell's] pants." (Campbell Aff. at ¶60, ECF #80-2 at Pg. ID 968.)  Campbell continued to object, and kept telling Mack that he (Campbell) did not have any drugs or other contraband. (*See id.* at ¶61, Pg. ID 968.)  Mack then "snatched [Campbell's] underwear down, exposing [Campbell's] anus and look[ed] back there, and then [Mack] looked in the front [of Campbell's pants]   at [Campbell's] private area of [Campbell's] genitals." (Campbell Dep. at 113, ECF #73-3 at Pg. ID 749.)  Mack's hands were "inside of

8

[Campbell's] underwear" during the search, and Mack "grabbed [Campbell's] genitals, pulling them, yanking them, just being very aggressive." (*Id.* at 119, Pg. ID 750.)  Even though Mack did not find anything during the strip search, he repeatedly accused Campbell of hiding drugs on his person, which Campbell denied. (*See* Campbell Aff. at ¶¶ 68-69, ECF #80-2 at Pg. ID 969.)

Mack then asked Campbell to remove his wedding ring. (*See id.* at ¶71, Pg. ID 969.)   Campbell initially protested, but he eventually removed his ring. Displaying apparent frustration with Campbell, Mack then "threw [the ring] on the counter." (*Id.* at ¶73, Pg. ID 969; *see also* booking room video, ECF #73-4.)  Mack then put on rubber gloves and conducted a body cavity search of Campbell.  It was during this search that Mack again placed his hands "inside [Campbell's] underwear" (Campbell. Dep. at 133, ECF #73-3 at Pg. ID 754) and "stuck his finger inside" Campell's anus:

> Officer Mack went into my underwear, he grabbed my testicles, he pulled them, disclosed them, he gets into the back of my underwear, still hands inside, and he stuck his finger inside of my anus.  When he did that I moved. When I moved, [Mack] instructed me to put my hands back up there and don't move, yelling with a very aggressive voice.

(*Id.* at 132, Pg. ID 753.)  Mack did not find anything during this search.

## C

There is no video of the roadside encounter between Campbell and Mack. However, the parties have submitted video of the encounter in the booking room of the Allen Park police station. (*See* ECF #73-4.) The Court has carefully reviewed that video multiple times. The video does not clearly show the entirety of Mack and Campbell's interaction. While the video plays smoothly at some times, it is jumpy and difficult to watch at others. Moreover, the camera angle and zoom of the camera lens makes it impossible to clearly confirm whether either Mack or Campbell has accurately described the entirety of the booking-room encounter.

## D

In sum, Campbell and Mack have presented conflicting evidence on the following facts:

- Whether the temporary license plate affixed to the back of Campbell's minivan was visible;

- Whether Campbell told Mack where his "home" was and whether Campbell said specifically what city he was coming from and what city he was driving to;

- Whether Campbell's pants were unzipped when he stepped out of the minivan and whether and how his pants became unzipped during the encounter;

- How much physical force Mack used to patdown and handcuff Campbell, and whether Mack tightened Campbell's cuffs after Campbell complained that they were too tight;

- Whether Mack walked his police dog Clyde around Campbell's minivan, whether the dog scratched at the front door of the van to indicate the presence of narcotics odor, and/or whether the dog was put directly into the van;

- Whether Campbell was moving while handcuffed in the backseat of Mack's police car;

- Whether Mack told Campbell that Mack would need to perform a strip and/or body cavity search of Campbell at the Allen Park police station;

- Whether Mack placed his hands inside of Campbell's underwear during the strip search; and

- Whether Mack placed his finger(s) inside Campbell's anus during the strip and/or body cavity search.

## II

Campbell filed this action on August 10, 2016. (*See* Compl., ECF #1.)  In Campbell's Amended Complaint, he alleges that Mack violated his (Campbell's) Fourth Amendment rights by (1) initiating a traffic stop without probable cause, (2) searching his van without probable cause, and (3) subjecting him to an unlawful strip and body cavity search. (*See* Am. Compl. at ¶¶ 35-38, ECF #28 at Pg. ID 143-44.) Campbell further asserts that Mack violated his First Amendments rights and retaliated against him for protected speech by "subject[ing] him to excessive handcuffing" and conducting a "wrongful strip and [body] cavity search." (Campbell Resp. to Mot., ECF #80 at Pg. ID 942; *see also* Am. Compl. at ¶¶ 35, ECF #28 at Pg. ID 143.)  Campbell also brings a municipal liability claim against Allen Park

and a claim against Mack for the intentional infliction of emotional distress. (*See* Am. Compl. at ¶¶ 40-47, ECF #28 at Pg. ID 144-47.)

Mack and Allen Park moved for summary judgment on all of Campbell's claims on March 20, 2018. (*See* ECF #73.) The Court held a hearing on the motion on August 1, 2018. (*See* ECF #83.)

### III

Mack argues that he is entitled to summary judgment on Campbell's constitutional claims because he did not violate Campbell's constitutional rights and, even if he did, he is entitled to qualified immunity. The summary judgment standard and its application in the qualified immunity context are well-established.

A movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact . . . ." *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 326-27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)) (quotations omitted). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson*, 477 U.S. at 252. Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.*

12

at 251-252. Indeed, "[c]redibility determinations, the weighing of the evidence, and the drafting of legitimate inferences from the facts are jury functions, not those of a judge . . . ." *Id.* at 255.

Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." *Green v. Throckmorton*, 681 F.3d 853, 864 (6th Cir. 2012) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "Once raised, it is the plaintiff's burden to show that the defendant[] [is] not entitled to qualified immunity." *Kinlin v. Kline*, 749 F.3d 573, 577 (6th Cir. 2014).

The United States Court of Appeals for the Sixth Circuit "has generally used a two-step [qualified immunity] analysis: (1) viewing the facts in the light most favorable to the plaintiff, [the court] determines whether the allegations give rise to a constitutional violation; and (2) [the court] assesses whether the right was clearly established at the time of the incident." *Id.* (internal punctuation omitted). "[U]nder either prong [of this inquiry], courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014). Indeed, in *Tolan*, the Supreme Court vacated a grant of summary judgment on a qualified immunity defense because, among other things, the lower court "credited the evidence of the party seeking summary judgment and failed to properly

acknowledge key evidence offered by the party opposing that motion." *Id.* at 1867–68. The Supreme Court explained that "[b]y weighing the evidence and reaching factual inferences contrary to [the non-moving party's] competent evidence, the court below neglected to adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party." *Id.* at 1867. Simply put, "where the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability." *Green*, 681 F.3d at 864.

## IV

## A

The Court first turns to Campbell's claim that Mack violated his (Campbell's) Fourth Amendment rights when Mack initiated the traffic stop. Mack argues that he is entitled to summary judgment on this claim because he "properly stopped and detained Campbell given his inability to visualize the paper license in the tinted back window of the vehicle Campbell was driving." (Mot., ECF #73 at Pg. ID 671.) Mack further maintains that to the extent he did violate Campbell's constitutional rights when he initiated the stop, he is entitled to qualified immunity. (*See id.* at Pg. ID 682-84.) The Court concludes that Mack is not entitled to summary judgment, or qualified immunity, on this claim.

14

In *United States v. Collazo*, 818 F.3d 247, 254 (6th Cir. 2016), Sixth Circuit "note[d] that the dividing line between when probable cause is required for a traffic stop and when reasonable suspicion is sufficient is in need of greater clarity in this circuit." *Collazo*, 818 F.3d at 254.  The Court need not determine that dividing line here, however, because when the facts are viewed in the light most favorable to Campbell, Mack had neither reasonable suspicion nor probable cause to stop Campbell for failing to display a license plate.

"An officer has probable cause when the facts and circumstances known to the officer warrant a prudent man in believing that an offense has been committed." *Miller v. Sanilac County*, 606 F.3d 240, 248 (6th Cir. 2010) (quoting *Henry v. United States*, 361 U.S. 98, 102 (1959)). "In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." *Green*, 681 F.3d at 865 (quoting *Parsons v. City of Pontiac*, 533 F.3d 492, 501 (6th Cir. 2008)).  An officer has "reasonable suspicion" when the officer has "a particularized and objective basis for suspecting [a] particular person of criminal activity." *Collazo*, 818 F.3d at 257.

Here, there is a material factual dispute as to whether Mack had either probable cause or reasonable suspicion to believe that Campbell was driving without a validly displayed license plate.  Campbell testified that at the time Mack initiated the traffic stop, a valid, temporary license plate was affixed to the back window of

15

the minivan. (*See* Campbell Dep. at 74-75, ECF #73-3 at Pg. ID 739.)  Campbell

further testified that it was "broad daylight" at the time of the stop (*id.* at 76, Pg. ID

739) and that the temporary plate was "written in large black characters, easily

visible from at least 20 yards behind the vehicle." (Campbell Aff. at ¶8, ECF #80-2

at Pg. ID 963.)  Campbell's wife also swore under oath that when she purchased the

van, "[t]he salesman had written the temporary license number with a thick black

magic marker, and the license numbers were clearly visible for at least 20 yards

behind the minivan." (Lakita Gilbert Affidavit at ¶7, ECF #80-4 at Pg. ID 1008.)

Taking this testimony as true, at the point Mack pulled behind Campbell's van and

decided to initiate a traffic stop, he would have seen the temporary license plate and

would have known that he did not have probable cause – or reasonable suspicion –

to stop Campbell for failing to display a valid plate.  Therefore, there is a factual

dispute as to whether the traffic stop violated Campbell's Fourth Amendment rights.

Mack is also not entitled to qualified immunity on this claim because, as noted

above, a jury could find that he stopped Campbell's van without probable cause or

reasonable suspicion, and at the time of the stop, the right to be free from such an

unlawful traffic stop was clearly established. *See*, *e.g.*, *United States v. Freeman*,

209 F.3d 464, 466 (6th Cir. 2000) (invalidating traffic stop based on a lack of

probable cause); *Smith v. Williams*, 78 F.3d 585, at *6 (6th Cir. 1996) (table) ("A

citizen's right to be free from traffic stops based on less than reasonable suspicion is

16

a clearly established right.")  Mack is therefore not entitled to qualified immunity with respect to Campbell's claim related to the traffic stop.

## B

During the hearing on Mack's summary judgment motion, Mack's counsel acknowledged that if there was a material factual dispute with respect to the validity of the traffic stop, then Mack would not be entitled to summary judgment on Campbell's other Fourth Amendment claims that followed from that stop (*i.e.*, Campbell's Fourth Amendment claims related to the search of his vehicle and the strip and/or body cavity search at the Allen Park police station).  Accordingly, because the Court has determined that there is a material factual dispute with respect to the validity of the traffic stop, the Court declines to grant Mack summary judgment on Campbell's other Fourth Amendment claims that arose out of that stop.

## V

The Court next turns to Campbell's claim that Mack violated his (Campbell's) First Amendment rights.  As described above, Campbell maintains that Mack violated his First Amendment rights by "subject[ing] [him] to excessive handcuffing" and conducting a "wrongful strip and [body] cavity search" in response to his complaints about Mack's conduct. (Campbell Resp. to Mot., ECF #80 at Pg. ID 942; *see also* Am. Compl. at ¶¶ 35, ECF #28 at Pg. ID 143.)

Under Sixth Circuit law, to establish a claim for First Amendment retaliation, Campbell must show that: "(1) [he] engaged in protected conduct; (2) an adverse action was taken against [him] […] and (3) there is a causal connection between" the protected conduct and the adverse action. *Thaddeus–X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). Mack argues that he is entitled to summary judgment because Campbell cannot satisfy either prong two or prong three of this test.[2] The Court disagrees.

In order for Campbell to satisfy the "adverse action" element of his retaliation claim, he must show that the action taken against him "would deter a person of ordinary firmness from continuing to engage in that conduct." *Id.* A jury could reasonably conclude that tightening a set of handcuffs in response to a complaint that the handcuffs are too tight and are injuring a person's wrists would deter a person of ordinary firmness from complaining about a police officer's behavior. Likewise, a jury could reasonably find that the rough manner in which Mack allegedly conducted the body search, including by aggressively groping and jostling the genitals, could deter a person from complaining about a police officer's conduct.

---

[2] At the hearing on Mack's summary judgment motion, Mack's counsel acknowledged that, for the purposes of summary judgment, Campbell engaged in protected conduct when he complained to Mack about Mack's conduct during the traffic stop and subsequent strip/body cavity search.

Next, for Campbell to satisfy the "casual connection" element of his First Amendment claim, he must establish that "the adverse action was motivated at least in part by [Campbell's] protected conduct." *Id.* This "prong of a First Amendment retaliation case can be supported by circumstantial evidence, with temporal proximity aiding in the analysis." *Spencer v. City of Catlessburg*, 506 F. App'x 392, 396 (6th Cir. 2012); *see also Holzemer v. City of Memphis*, 621 F.3d 512, 526 (6th Cir. 2010) (noting reluctance to find retaliatory motive based on evidence of temporal proximity alone, but concluding that the evidence before the court, if true, created an inference of retaliatory motive where temporal proximity existed along with other supporting evidence).

Here, a jury could reasonably conclude that Campbell has established a causal connection between his protected conduct and both (1) the tightening of the handcuffs and (2) the manner in which Mack conducted the strip and body cavity searches. Campbell has presented evidence that Mack tightened the handcuffs immediately after Campbell complained that they were hurting him and that Campbell then retorted, "[t]hat's the loosest they're going to get." (Campbell Dep. at 88, ECF #73-3 at Pg. ID 742.) Campbell has also submitted evidence (including the video of his booking room interaction with Mack) that shortly before Mack conducted the strip and body cavity searches, Mack grew frustrated with Campbell's complaints that he (Campbell) was being mistreated. As one example, the video

(when viewed in the light most favorable to Campbell) depicts Mack becoming irritated when Campbell objected to Mack's command that he (Campbell) remove his wedding ring, and the video then depicts Mack throwing the ring on to a table. Taken together, this evidence establishes both (1) a temporal proximity between Campbell's complaints of mistreatment and Mack's retaliatory conduct and (2) that Mack was bothered by Campbell's complaints and thus may have had a motive to retaliate against Campbell for those complaints. This evidence is sufficient to support an inference that there was a causal connection between Campbell's complaints and Mack's mistreatment of Campbell. Thus, Mack is not entitled to summary judgment on Campbell's First Amendment claim on the ground that Campbell cannot establish the causation element of the claim.

Mack is also not entitled to qualified immunity on Campbell's First Amendment retaliation claim because, as described above, a jury could find for Campbell on that claim, and Campbell's right to be free from retaliation based on protected conduct was clearly established. *See*, *e.g.*, *Greene v. Barber*, 310 F.3d 889, 895 (6th Cir. 2002) ("The law is well established that an act taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983….") (internal punctuation omitted); *Everson v. Calhoun Cty.*, 407 F. App'x 885, 887 (6th Cir. 2011) ("It is clearly established that the First Amendment prohibits government

officials from subjecting an individual to retaliatory actions….") (internal quotation marks omitted).

## VI

The Court next addresses Campbell's municipal liability claim against the City of Allen Park.  In this claim, Campbell alleges that Allen Park failed to train and/or supervise Mack and that the City's "customs, policies, or practices [] were a proximate cause and moving force in [the] violations of [Campbell's] rights under the United States Constitution." (Am. Compl. at ¶41, ECF #28 at Pg. ID 144-45.) Campbell seeks to hold Allen Park liable for these failures with respect to the body cavity search and the strip search that took place at the Allen Park police station. The Court will examine the body cavity search claims and the strip search claims separately.

## A

It is well-settled that a governmental entity, such as the City of Allen Park, cannot be held vicariously liable under 42 U .S.C. § 1983 for the acts or omissions of its employees. *See Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978).  Rather, to hold a municipality liable under Section 1983, a plaintiff must come forward with evidence that an unconstitutional policy, custom, or practice was the proximate cause of his injuries. *See id.* at 694.  And this "official policy or custom must be the moving force of the constitutional violation to establish

the liability of a government body." *Jones v. City of Cincinnati*, 521 F.3d 555, 560 (6th Cir. 2008) (internal quotation marks omitted).  Indeed, a plaintiff must "show a direct causal link between the custom and the constitutional deprivation; that is, []he must show that the particular injury was incurred because of the execution of that policy." *Doe v. Clairborne County, Tenn. By and Trough Clairborne County Bd. of Educ.*, 103 F.3d 495, 508 (6th Cir. 1996) (internal quotation marks omitted).

"There are at least four avenues a plaintiff may take to prove the existence of a municipality's illegal policy or custom.  The plaintiff can look to (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005).

## B

### 1

Campbell initially contends that Allen Park is liable for failing to provide adequate training to Mack regarding body cavity searches.  The Court concludes that this claim fails for two reasons.

First, Campbell has not produced any evidence that Allen Park failed to train Mack with respect to body cavity searches.  And Mack's unrefuted testimony is that Allen Park *did* provide such training.  More specifically, Allen Park instructed him

22

that he "can't do" body cavity searches on suspects and that "[t]he only way they can be done is in a medical setting by a licensed doctor." (Mack Dep. at 71-72, ECF #73-2 at Pg. ID 718.)  Campbell has not even attempted to show why or how this training was insufficient.

Second, Campbell has failed to present evidence that any alleged failure to train Mack with respect to body cavity searches caused the allegedly-unlawful body cavity search here.  Mack testified that he understood that he could not perform a body cavity search on a suspect. (*See id.*)  Because Mack performed the body cavity search even though he knew it was wrong to do so,[3] that body cavity search did not result from Allen Park's failure to train Mack that he could not perform such a search.  Accordingly, Campbell's failure to train claim related to the body cavity search fails for lack of causation.

**2**

Campbell next asserts that Allen Park had a custom or practice of conducting and/or tolerating unconstitutional body cavity searches.  In order to establish that a municipality had a "custom of tolerance or acquiescence of federal rights violations," a plaintiff must show "(1) the existence of a clear and persistent pattern

---

[3] The Court acknowledges that Mack denies that he conducted a body cavity search of Campbell.  But, on summary judgment, the Court must view the evidence in the light most favorable to Campbell and that includes Campbell's testimony that the body cavity search happened and that Mack stuck his finger inside Campbell's anus during that search.

of [illegal activity]; (2) notice or constructive notice on the part of the [defendant]; (3) the [defendant's] tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) that the [defendant's] custom was the 'moving force' or direct causal link in the constitutional deprivation." *Thomas*, 398 F.3d at 429.

This claim fails because Campbell has not identified or produced evidence of any other body cavity searches conducted by Mack or any other Allen Park police officer. Thus, Campbell has failed to establish a "clear and persistent pattern of" illegal body cavity searches. *Id.* Nor has Campbell produced evidence that Allen Park knew of and "tacitly approv[ed]" of illegal body cavity searches by its police officers. *Id.* Campbell has therefore not created a genuine issue of material fact on his "custom or practice" claim related to the body cavity search.

## C

The Court now turns to Campbell's claim that Allen Park failed to adequately train and/or had a custom or practice of conducting and/or tolerating unconstitutional strip searches. In Allen Park's summary judgment motion, it argued that this claim fails because "[e]ven if Campbell can establish that the [strip] searches Mack conducted were illegal … no evidence exists to establish that [Allen Park] knew or reasonably should have known of any previous illegal searches conducted by Mack or any other [Allen Park Police Department] officers or that any [Allen Park Police

24

Department] officer was violating citizens' constitutionally-protected rights." (Mot., ECF #73 at Pg. ID 687-88.)

In response to Allen Park's argument, Campbell directed the Court to the Sixth Circuit's decision in *Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006).  In *Gregory*, the Sixth Circuit reversed a grant of summary judgment to a municipality on a claim seeking to hold the municipality liable for its police officers' mishandling of exculpatory evidence.  The court held that summary judgment was inappropriate because there was evidence that the city provided *no* training to its officers with respect to a recurring aspect of their duties that had the potential to impact the important constitutional rights of criminal suspects:

> Here, Plaintiff alleges that [the police officers'] failures to disclose exculpatory materials were the highly predictable consequence[s] of a failure to equip law enforcement officers with specific tools to handle recurring situations. In their investigative capacities, police officers regularly uncover exculpatory materials.
>
> [….]
>
> At a minimum, Plaintiff has presented sufficient evidence to survive summary judgment on his failure to train allegations regarding exculpatory materials. The obligation to turn over exculpatory materials is a significant constitutional component of police duties with obvious consequences for criminal defendants. This Court has held that evidence pointing to a City's failure to provide *any* training on key duties with direct impact on the constitutional rights of citizens is sufficient to survive summary judgment with a *Monell* failure to train claim.

25

*Id.* at 754 (emphasis in original; internal citations and quotation marks omitted).

The Court finds *Gregory* instructive.  Like the mishandling of exculpatory evidence in *Gregory*, the right to be free from unlawful and aggressive strip searches has "obvious consequences for criminal defendants" with a "direct impact on [their] constitutional rights." *Id.*   Moreover, just as the officers in *Gregory* were not infrequently required to handle exculpatory evidence, there is reason to believe that Allen Park officers (and Mack in particular) conduct strip searches (or are at least faced with the decision whether to conduct such searches) on a recurring basis.  Indeed, the potential for strip searches of suspects by police in Michigan is sufficiently prevalent that the Michigan Legislature felt the need to pass a statute regulating such searches, *see* Mich. Comp. Laws § 764.25a,[4] and Mack himself testified that he "had been making people drop 'em'" in order to conduct strip searches of suspects he believed had drugs "for 22 years." (ECF #80-17 at Pg. ID 1185.)

---

[4] To be clear, the Court is not holding that Mack *violated* Mich. Comp. Laws § 764.25a when he conducted the strip search of Campbell.  It only points out the existence of the statute as evidence that strip searches are sufficiently common that the Michigan Legislature felt compelled to regulate them.

Given these apparent similarities between *Gregory* and the circumstances of this case, the Court is not currently convinced that Allen Park is entitled to judgment as a matter of law on Campbell's *Monell* claim related to the strip search.[5]

## VII

Finally, the Court addresses Campbell's intentional infliction of emotional distress claim. Under Michigan law, the elements of a claim of intentional infliction of emotional distress are "(1) extreme or outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress." *Webster v. United Auto Workers, Local 51*, 394 F.3d 436, 442 (6th Cir. 2005). "In ruling on such a claim, it is initially for the trial court to determine whether the defendant's conduct reasonably may be regarded as so extreme and outrageous as to permit recovery." *Id.* (internal punctuation omitted).

In *Roberts v. Auto-Owners Ins. Co.*, 374 N.W.2d 905 (Mich. 1985), the Michigan Supreme Court explained that:

---

[5] Allen Park's reply brief provided no response to Campbell's invocation of *Gregory*; Allen Park has not attempted to distinguish that decision. In the absence of a showing by Allen Park that *Gregory* is distinguishable in any material respect, the Court is not willing to conclude, at this point, that Allen Park is entitled to judgment as a matter of law on Campbell's failure to train claim related to the strip search. If Allen Park wishes to renew its legal challenge to the claim, it may do so after Campbell has presented his proofs at trial and/or in post-trial motions. At that point, the Court will carefully consider Allen Park's arguments concerning *Gregory* as well as any other arguments the parties may wish to present with respect to the sufficiency of Campbell's evidence on this claim.

> The cases thus far decided have found liability [for the intentional infliction of emotional distress] only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice', or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'

*Id.* at 909; *see also Webster*, 394 F.3d at 442 ("Extreme or outrageous conduct is that which goes beyond the bounds of decency and would be considered atrocious and utterly intolerable in civilized society").

The Court acknowledges that the threshold for showing "extreme and outrageous conduct" is substantial. Here, however, when the evidence is viewed in the light most favorable to Campbell, a jury could reasonably conclude that Mack engaged in extreme or outrageous conduct when he (1) tightened Campbell's handcuffs in response to Campbell's complaints that the cuffs were too tight and were hurting his wrists and (2) subjected Campbell to a body search that included aggressive manipulation of Campbell's genitals and sticking a finger inside Campbell's anus. Accordingly, Mack is not entitled to summary judgment on Campbell's claim for intentional infliction of emotional distress.

28

Mack counters that he has governmental immunity from this claim under Michigan law. (*See* Mot., ECF #73 at Pg. ID 690-92.) "To qualify for governmental immunity under Michigan state law for intentional torts ... a governmental employee must establish that: (1) the employee undertook the challenged acts during the course of his employment and was acting, or reasonably believed he was acting, within the scope of his authority, (2) the employee undertook the challenged acts in good faith or without malice, and (3) the acts were discretionary, rather than ministerial, in nature." *Binay v. Bettendorf*, 601 F.3d 640, 653 (6th Cir. 2010) (citing *Odom v. Wayne Cty.*, 760 N.W.2d 217, 228 (Mich. 2008)).  Here, for all of the reasons stated above, a jury could reasonably conclude that Mack's actions of tightening Campbell's handcuffs in response to Campbell's complaints that the cuffs were too tight and conducting the strip and body cavity searches in an aggressive manner were not undertaken in "good faith or without malice."  Accordingly, Mack is not entitled to summary judgment on the basis of governmental immunity.

## VIII

For all of the reasons stated above, **IT IS HEREBY ORDERED** that Mack and the City of Allen Park's motion for summary judgment (ECF #73) is **GRANTED IN PART AND DENIED IN PART** as follows:

- The motion is **GRANTED** with respect to: (1) Campbell's claims against Patrick Moore and Kevin Gersky, (2) Campbell's claims against Mack in his

official capacity, and (3) Campbell's municipal liability claim against Allen

Park as to the alleged body cavity search **only**;

- The motion is **DENIED** in all other respects.

<div style="margin-left:40%">

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

</div>

Dated:  September 12, 2018


I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on September 12, 2018, by electronic means and/or ordinary mail.

<div style="margin-left:40%">

s/Holly A. Monda
Case Manager
(810) 341-9764

</div>